**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.: 1:22-CV-21220-GAYLES/TORRES**

VIBRANT LICENSING LLC,

Plaintiff,

v.

HMD AMERICA, INC.,

Defendant.

**DEFENDANT HMD AMERICA, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... **1**

**II. THE '045 PATENT** .......... **1**

**III. LEGAL PRINCIPLES** .......... **4**

A. Claim Construction .......... 4

B. Indefiniteness .......... 8

**IV. DISPUTED TERMS** .......... **9**

A. "*generates a respective signal change having a magnitude corresponding to a strength of the touch in its respective associated measurement circuitry*" (claim 1) .......... 9

B. "*measurement circuitry electrically coupled to both the display and to each of the plurality of touch-sensitive locations*" (claim 1) .......... 13

**V. CONCLUSION** .......... **15**

## TABLE OF AUTHORITIES

### CASES

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002)........8, 9

*Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.*,
346 F. Supp. 3d 643 (D.N.J. 2016)........7

*Comput. Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008)........6

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001)........13, 14

*Every Penny Counts, Inc. v. Am. Express Co.*,
563 F.3d 1378 (Fed. Cir. 2009)........5

*Fenner Invs., Ltd. v. Hewlett-Packard Co.*,
C.A. No. 08-CV-273, 2009 WL 3734102 (E.D. Tex. Nov. 4, 2009)........7

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008)........8

*In re Katz Interactive Call Processing Pat. Litig.*,
639 F.3d 1303 (Fed. Cir. 2011)........6

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
302 F.3d 1352 (Fed. Cir. 2002)........6

*Liebel-Flarsheim Co. v. Medrad Inc.*,
C.A. No. 1:04-cv-607 2006 WL 335846 (S.D. Ohio Feb. 14, 2006)........7

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)........4

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009)........6

*Medrad, Inc. v. MRI Devices Corp.*,
401 F.3d 1313 (Fed. Cir. 2005)........5

*Microsoft Corp. v. Int'l Trade Comm'n*,
731 F.3d 1354 (Fed. Cir. 2013)........12

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998)....................5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....................8

*Nazomi Comm'ns, Inc. v. Arm Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005)....................13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................7

*Omega Eng'g, Inc, v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................6, 12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................4, 5, 7, 10

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
438 F.3d 1123 (Fed. Cir. 2006)....................6

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)....................5

*Thorner v. Sony Comp. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....................5

**STATUTES**

35 U.S.C. § 112....................8

America Invents Act, Pub. L. No. 112-29 ....................8

## I. INTRODUCTION

In this action, Plaintiff Vibrant Licensing LLC ("Vibrant") accuses HMD America Inc. ("HMD") of infringing U.S. Patent No. 8,243,045 ("the '045 Patent") directed to touch-sensitive-display technology. Touch-sensitive displays have become ubiquitous in nearly every modern mobile device since at least the introduction of the iPhone in 2007. The '045 Patent was filed years later (and not by Vibrant). Nevertheless, having now purchased the patent for monetization, Vibrant asserts it against numerous mobile-device manufacturers (including HMD) as though its claims encompass all touch-sensitive displays. They do not. In reality, the claims are narrow and purportedly directed to a *particular* display—one that measures the "strength of the touch" to generate a variable-response signal.

The HMD device that Vibrant accuses of infringement—Nokia 9 PureView—does not embody the claimed invention under any possible construction. Yet Vibrant asks this Court not to construe and bring clarity to its vague claims, presumably to forestall dismissal while it seeks a settlement payment. Vibrant simply asks this Court to adopt a "plain and ordinary meaning" construction without any elaboration, so that Vibrant may press ahead. Vibrant also brushes aside a fundamental and irresolvable ambiguity in its issued claims, again relying on the shibboleth of "plain and ordinary meaning." The Court should not countenance this approach, but should instead bring necessary clarity to the terms that are capable of being construed, and find those that cannot as indefinite.

## II. THE '045 PATENT

The '045 Patent is directed to "a touch-sensitive LED display device," such as those "widely used for inputting data in a variety of electronic devices … such as mobile phones and cameras." Ex. A (the '045 Patent) at Abstract, 1:6–8. According to the '045 Patent, "[i]n prior art touch screen applications, a touch screen sensor panel is disposed over or under a display, but the

display does not play a role in determining the location of a touch." *Id.* at 1:8–11. The invention described in the '045 Patent, however, purportedly involves "a single LED display panel [that] may serve as both a display … and a touch screen." *Id.* at 2:15–18.

The '045 Patent begins by explaining the basic operation of (prior art) OLED displays. Specifically, the Patent notes how such displays are made up of at least two conductive layers that sandwich organic molecules between them. *Id.* at 3:33–40. The conductive layers are given opposite electrical charges, such that when an electrical voltage is applied to one of them, the voltage travels through the organic molecules to reach the oppositely charged layer on the other side. *Id.* at 3:40–60. That voltage causes the organic molecules to illuminate, which generates the visible-light source for the display. *Id.* at 3:40–60.

To enable the touch-sensitive functionality, the '045 Patent then explains how one of the conductive layers is arranged in "columns," and the other in "rows." *Id.* at 33–35. When the two layers are put together (with the organic molecules still sandwiched between), the columns and rows create "nodes" (like grid paper). *Id.* at 3:40–45. Below is a top-down view of the grid:




FIG. 1

These nodes are then connected to a "measurement circuit," which measures the voltage traveling along the node (*e.g.*, from the row on one layer to the column on the other). *Id.* at 4:19–36. As shown in the side-view image below, when a user (260) touches the column layer (201), their skin creates a miniature circuit that changes the electrical signal (via "capacitance") traveling along the node, which is then measured by the "measurement circuit." *Id.* at 4:1–18.




FIG. 2

The Patent further notes how "drive circuitry" can supply a voltage low enough to create a capacitance field (*e.g.*, that allows for touch functionality), but not high enough to make the organic molecules light up (*e.g.*, to turn on the display). *Id.* at 47–60. That way, the display can respond to touch even if the light source is not active. According to the '045 Patent, the configuration of these various layers allows for the "combin[ation of] display and touch-sensitive circuitry." *Id.* at 2:12–20.

The '045 Patent then explains how a processor can be used to locate where in the grid of nodes a touch has occurred. Specifically, "the sensor circuits are affected to varying degrees

depending on the strength of the touch in the area of [the] node [] associated with the circuit." *Id.* at 6:23–27. Simply put, "[t]he ***harder*** the display is touched, the higher the degree of distortion in the [touch] signal (e.g., the capacitance field and/or electrical current is changed to a higher degree)." *Id.* at 2:65–3:4 (emphasis added). Figure 4A, for instance, shows an example of how the system would experience a finger press on the display, with "a central ***force*** point of the touch" in the middle, and less-intense touch points that "radiate from the central ***force*** point." *Id.* at 6:45–53 (emphasis added). The processor would use this information to determine that the location of the "central force point"—*i.e.*, where the display was touched the hardest—was the intended target. *Id.*




FIG. 4A

## III. LEGAL PRINCIPLES

### A. Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*; internal quotation and citations omitted). For this reason, "[a] claim must be construed before determining its validity just as it is first construed before deciding infringement." *See Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 996 n.7 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996); *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) ("[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury."). The claims are construed as a matter of law, even though subsidiary factfinding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325–27 (2015).

"[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13 (internal quotation and citations omitted). The plain and ordinary meaning of a claim term is intended to be "an objective baseline from which to ***begin*** claim interpretation." *Id.* at 1313 (emphasis added).

The plain and ordinary meaning of a disputed claim term cannot be determined "in a vacuum." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005). Instead, the disputed term must be construed "in the context of the entire patent[.]" *Phillips*, 415 F.3d at 1313. Thus, courts should begin the claim-construction process "by reviewing the same resources as would [the person of ordinary skill], *viz.*, the patent specification and the prosecution history." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). "[A]part from the [specification] and prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.

In some instances, an inventor may "act as its own lexicographer" in the specification, which means that the inventor "set[s] forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Comp. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "Where … the patentee has clearly defined a claim term, that definition usually is

dispositive." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360–61 (Fed. Cir. 2002) (internal marks omitted); *see, e.g.*, *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380–82 (Fed. Cir. 2009) (finding a patent's use of the word "animals" included humans because the specification stated that "'[t]he term 'animal' means any organism belonging to the kingdom Animalia' … [and] it is undisputed that humans are members of the kingdom Animalia.").

"Statements made during prosecution [before the U.S. Patent and Trademark Office] may also affect the scope of the claims." *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). For instance, "a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution," *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006), such as "by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Comput. Docking*, 519 F.3d at 1374. To prevent patentees from attempting to take different or contradictory positions ***after*** the patent issues, the Supreme Court has established the doctrine of "prosecution disclaimer," which "preclude[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323–24 (Fed. Cir. 2003). Specifically, the doctrine enables courts to "narrow[] the ordinary meaning of the claim congruent with the scope of the surrender." *Id.*; *see, e.g.*, *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1324–25 (Fed. Cir. 2011) (construing the term "personal identification data" to exclude changeable data such as passwords and PIN numbers because the patentee argued during prosecution that the term was directed to more-permanent data such as a user's name, address, phone number, and the like).

Although emphasis should be placed on the intrinsic evidence, district courts are also authorized "to rely on extrinsic evidence, which consists of all evidence external to the patent … including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. However, such evidence is generally "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (citations and internal quotations omitted).

Courts must also be mindful that, in some cases, "[a] determination that a claim term … has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Indeed, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id.* at 1362; *see also, e.g.*, *Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.*, 346 F. Supp. 3d 643, 653 (D.N.J. 2016) ("[A] blanket resort to the 'ordinary' meaning of the disputed claim terms would leave unresolved the parties' disputes, and would largely negate the importance of the claims construction process."); *Fenner Invs., Ltd. v. Hewlett-Packard Co.*, C.A. No. 08-CV-273, 2009 WL 3734102, at *6 (E.D. Tex. Nov. 4, 2009) (construing term because "claim construction is necessary to insure [sic] that a jury will understand what is claimed."); *Liebel-Flarsheim Co. v. Medrad Inc.*, C.A. No. 1:04-cv-607 2006 WL 335846, at *6 (S.D. Ohio Feb. 14, 2006) ("[A] patentee cannot avoid defining its own claim terms by asserting that its claims have a plain meaning.").

**B. Indefiniteness**

Pre-AIA[1] 35 U.S.C. § 112, paragraph 2 states, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." This statutory provision is often called the "definiteness" requirement. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "On the one hand, the definiteness requirement must take into account the inherent limitations of language." *Id.* at 909. "At the same time, a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* (citations, internal quotations, and brackets omitted).

Patent claims, viewed in light of the specification and prosecution history, must inform those skilled in the art about the scope of the claimed invention with "reasonable certainty." *Id.* at 901, 910; *see also Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[T]he patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention …."). A lack of definiteness renders a claim (and its dependent claims) invalid, and the Court may not rewrite the claim to preserve its validity. *See Nautilus*, 572 U.S. at 902; *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).

---

[1] 35 U.S.C. § 112 was amended and subsections were renamed by the America Invents Act, Pub. L. No. 112-29 ("AIA"), which took effect on September 16, 2012. The '045 Patent was filed on March 10, 2009, accordingly, "pre-AIA" § 112 applies.

## IV. DISPUTED TERMS

### A. "*generates a respective signal change having a magnitude corresponding to a strength of the touch in its respective associated measurement circuitry*" (claim 1)

| Vibrant's proposal | HMD's proposal |
|---|---|
| Plain and Ordinary Meaning | "generates a respective signal change having a magnitude corresponding to the force or displacement of the display at the location of the touch in its respective associated measurement circuitry" |

The term "strength of the touch" requires construction because the parties fundamentally dispute the scope of this term. The patent consistently uses the phrase "strength of the touch" to refer to the varying amounts of force, or displacement of the display, at the location of the touch. In common-sense terms, the harder a user presses, the more force the user applies to the display and the more the display bends (even just slightly). *See* Ex. A at 3:1–4. Measuring circuitry, in turn, measures the amount of force or displacement and "generates a respective signal change having a magnitude corresponding to the force or displacement of the display[.]" This interpretation is supported by all intrinsic evidence. *See, e.g.*, *id.*; *see also id.* at 6:23–27; Ex. B (the '045 File History) at VIB000137, 173–74.

Vibrant, however, has taken an artificially broader view of its claims, one that is divorced from the intrinsic evidence. Specifically, Vibrant seemingly takes the position that because touching a display inherently requires some "strength," any display that responds to touching falls within the scope of its claims. *See* Ex. C (Vibrant's Final Preliminary Infringement Contentions Claim Chart, page numbering added) at 11–15 (for the "strength of the touch" limitation, relying on an article describing the ***generic*** functionality of all capacitive touchscreen displays: that they measure "the change in capacitance when a user touches the screen."). What Vibrant ignores,

however, is that the original owners of the ’045 Patent expressly ***disclaimed*** such a construction during prosecution of their Patent. The Court should foreclose Vibrant’s attempts to reclaim such claim scope through its deliberately vague, “plain-and-ordinary-meaning” construction.

Turning first to the intrinsic evidence, *Phillips*, 415 F.3d at 1314, the specification and claims repeatedly describe the invention as a display device that is “affected to varying degrees depending on the strength of the touch.” Ex. A at 6:23–27. Indeed, the ’045 Patent itself recognizes that a user’s touch produces “signals corresponding to ***the force or displacement of the display*** at the various nodes 321 … and the node(s) 321 having the highest magnitude of change may be identified as the location of the touch.” *Id.* at 6:30–34; *see also id.* at 2:65–3:4 (“this degree of change in each circuit ***is related to the force or displacement*** on the touch-sensitive display resulting from the finger touch. ***The harder the display is touched, the higher the degree of distortion*** ….”) (emphasis added). The ’045 Patent further explains that the claimed invention uses these differences in force or displacement to “determine a location of the touch … where the respective signal change has the highest magnitude.” *Id.* at cl. 1; *id.* at 7:2–3 (“the location of the display touched the hardest”). In other words, the device “compare[s] the relative strengths” of the signals generated by the touch to determine where on the display the touch was intended. *Id.* at 9:27–62.

This interpretation is consistent with how both the patentee and patent examiner understood the claims during prosecution of the ’045 Patent as well. *See Phillips*, 415 F.3d at 1317 (“Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.”). During prosecution, the examiner relied on a reference called Caldwell (U.S. Patent No. 7,361,860) to reject Vibrant’s original claims, Ex. B at VIB000107–08, which were drafted without the “strength of the touch” limitation, *id.* at VIB000053–57. In response, to

distinguish its invention from the already-known design in Caldwell, the patentee amended the claims to introduce the "strength of the touch" limitation. *See, e.g.*, *id.* at VIB000131. The patentee then argued that Caldwell did not teach a display that "generates a signal change of ***varying magnitude depending on a strength of the touch***," but rather that "Caldwell describes at most only an on-or-off type touch switch (e.g., 'touch' or 'no touch" ….)." *Id.* at VIB000137. When the examiner maintained its rejection of the amended claims in view of Caldwell, *id.* at VIB000148–49, the patentee followed up and persuaded the examiner that "Caldwell only describes a single touch switch and a control circuit which is only configured to sense an On or Off state ('Touch' or 'No-Touch')," and that "[a]ll touch switches affected by a touch as described by Caldwell would provide instead ***a same magnitude signal***." *Id.* at VIB000173–74 (emphasis added). Thus, the patentee affirmed that one of the distinguishing features of the '045 Patent is that the signal generated in response to the touch varies based on the amount of force being applied to the display or the amount the display displaces.

In similar circumstances as these, the Federal Circuit has endorsed narrowly construing the claims due to prosecution history disclaimer. For instance, in *Technology Properties Ltd. v. Huawei Technologies*, the patent-at-issue concerned a computing device that combined a computer processor and its timing clock (or "oscillator") into a single circuit. 849 F.3d 1349, 1353 (Fed. Cir. 2017). The claims recited "[a] microprocessor system comprising … ***an entire oscillator*** disposed upon [an] integrated circuit substrate and connected to [a] central processing unit." *Id.* at 1354 (emphasis altered). When the parties disputed the proper construction of this term during litigation, the district court turned to the prosecution history of the patent to resolve the dispute. *See id.* at 1355. Specifically, the district court found that, during prosecution, the patent examiner rejected the claims as being taught by a prior-art reference called Magar. *Id.* In response, the

patentee argued that Magar did not teach the claimed "entire oscillator" for two reasons: that (1) Magar used a fixed clock, not a variable clock; and (2) Magar's clock was not on the same circuit as the processor. *Id.* at 1355–56; *see also id.* at 1358. Because the patentee made these arguments during prosecution, the district court construed the term "entire oscillator" to mean an oscillator "whose frequency is not fixed by any external crystal" (*e.g.*, that the clock is variable and integral to the processor circuit). *Id.* at 1354. The Federal Circuit then affirmed this narrowing construction on appeal. *Id.* at 1359.

The same type of narrowing construction based on the prosecution history is warranted here. As noted above, the specification repeatedly references a touch-sensitive display that produces a variable signal responsive to different "strength[s] of the touch." Ex. A at 6:30–34; *see also id.* at 2:65–3:4, 7:2–3, 9:27–62. And like the patentee in *Technology Properties*, the patentee here made clear and unmistakable arguments during prosecution that "strength of the touch" was distinguishable from a simple "Touch or No-Touch" condition. On this basis, Vibrant should not be permitted to "recaptur[e] through claim interpretation [the] meanings disclaimed during prosecution" by the patent's original owner. *Omega*, 334 F.3d at 1323–24. And because the term "strength of the touch" is ambiguous as to whether such an interpretation is excluded, the term "begs for clarification from the specification." *Microsoft Corp. v. Int'l Trade Comm'n*, 731 F.3d 1354, 1360 (Fed. Cir. 2013) (rejecting plain-and-ordinary-meaning construction for the term "resource state information" because the term "'state' is so general on its face" that it requires construction). For this reason, the Court should clarify that "strength of the touch" means the "force" or "displacement of the display" at the location of the touch, as described in the specification, Ex. A at 6:30–34, to bring clarity to the scope of the claims.

**B. “*measurement circuitry electrically coupled to both the display and to each of the plurality of touch-sensitive locations*” (claim 1)**

| **Vibrant’s proposal** | **HMD’s proposal** |
|---|---|
| Plain and Ordinary Meaning | Indefinite |

This term should be declared indefinite because it contains an apparent contradiction that cannot be reconciled as to how the “measurement circuitry” is electrically coupled to the display. Specifically, claim 1 defines “a display [as] ***comprising*** a plurality of touch-sensitive locations.” (emphasis added). In patent law, the word “comprising” is generally “synonymous with ‘including.’” *Nazomi Commc’ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005); *see also Crystal Semiconductor Corp. v. TriTech Microelectronics Int’l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) (noting “comprising” “creates a presumption that the recited elements are [] a part of the device….”). Yet the same claim goes on to state that “measurement circuitry” is “electrically coupled ***to both the display and to the plurality of touch-sensitive locations***.” It is unclear how the measurement circuitry can be electrically coupled to both the display (which is already made up of the touch locations) and the touch locations themselves. And because the specification fails to resolve this ambiguity, the claim should be declared indefinite.

Courts routinely find claims indefinite for reciting ambiguous or contradictory connections between various components. For instance, in *Koki Holdings Co. v. Kyocera Senco Industrial Tools, Inc.*, the district court found the claimed “exterior frame to which [a] channel is fluidly connected” was indefinite because of an apparent contradiction in the claimed connections. C.A. No. 18-313, 2021 WL 1092579, at *1–2 (D. Del. Mar. 22, 2021). In that case, the court took issue with the fact that the “exterior frame is indisputably a solid,” yet the claims required the valve to be “fluidly connected” to a channel. *Id.* at *1. The court ultimately found the claims indefinite

because "[n]othing in the record explains how [it] is possible" to create a ***fluid*** connection between a solid and a channel, and rejected the patentee's arguments that mere contact between the two was enough. *Id.* at *1–2.

Likewise, in *Smith v. ORBCOMM, Inc.*, another court found the term "said inputs to be controlled" indefinite because of an apparent contradiction in the way the components were arranged. C.A. No. 14-666, 2015 WL 5302815, at *12 (E.D. Tex. Sept. 10, 2015). Specifically, the claim not only stated that the inputs were to be "controlled," but also that the "inputs … are operable for monitoring." *Id*. Yet neither the specification nor claims provided any guidance as to "how [] inputs 'operable for monitoring' are to be controlled … where [the control] comes from, and how it operates." *Id*. The court concluded that "a person of ordinary skill in the art is left without any guidance about: (a) who or what exerts the control over the inputs, (b) how the control is exerted, and (c) the extent of the control that is exerted over the inputs." *Id*. The court accordingly found the claims indefinite. *Id.*

The exact same reasoning applies here: the '045 Patent provides no guidance as to how the claimed measurement circuitry can be "electrically coupled to both" (a) "the display" and (b) "the plurality of touch-sensitive locations" of that same display. The specification appears to define the "touch-sensitive locations" as the locations where the measurement circuitry is connected to the display. Ex. A at 6:10–18 ("OLED shared display and measurement circuit 300 includes [(among other things)] a touch-sensitive display pixel 305 … node 321 … [and] measurement circuitry 335…. A capacitance 350 is applied to the touch-sensitive display at pixel 305 via touch, and results in a current flow, … which is "transmitted to the measurement circuitry 335, which measures the change in current[.]"); 9:45–49 ("[T]he measurement circuitry may be configured to sense the change in the measurement circuitry as a signal distortion for each of the one or more

touch-sensitive locations affected by the touch.”). This makes sense, as the measurement circuit is what senses the touch. Consistently, the ’045 Patent further explains that not all locations of the display need to be coupled to the measurement circuit; some locations can simply be a display without any touch sensitivity. *Id.* at 6:34–44 (“OLED touch-sensitive display devices may include OLED shared display and measurement circuits 300 for [less than 100 percent of the display] … with the remainder percent being non-sensing OLED circuits (e.g., OLED circuits ***that do not include measuring circuitry*** ….)”) (emphasis added). Thus, in the ’045 Patent, a “touch-sensitive location” exists where the measurement circuit is electrically coupled to the display, not the other way around.

Nowhere does the ’045 Patent explain how a measurement circuit can be electrically coupled to the display at a location other than a touch-sensitive location. Instead, the ’045 Patent simply parrots the same ambiguous language found in the claims. *See, e.g.*, *id.* at 4:63–67 (“measuring circuitry 230 may be electrically coupled at each node 221 [(*e.g.*, the touch-sensitive locations)] … ***and to the OLED touch-sensitive display*** 200 generally”) (emphasis added); 4:37–42 (“measurement circuitry electrically coupled to the display and to each of the plurality of touch sensitive locations”). Like *Smith*, however, these descriptions cannot save the claims because they fail to explain what, if any, a coupling at non-touch-sensitive locations would be, what it would be used for, or why it would not simply be considered another “touch-sensitive location” because of its connection to the measurement circuit.

Because it is impossible to tell exactly what the patentee intended to claim with this phrase (or what the claims do, in fact, cover), the claim should be declared indefinite.

## V. CONCLUSION

For the foregoing reasons, HMD’s proposed constructions should be adopted.

Dated: October 7, 2022

Respectfully submitted,

MATTHEW J. MOFFA, ESQ.
NY Bar No. 504067
*(Pro hac vice)*
mmoffa@perkinscoie.com
WILLIAM J. MCCABE, ESQ.
NY Bar No. 2258085
*(Pro hac vice)*
wmccabe@perkinscoie.com
**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd floor
New York, NY 10036
Telephone: (212) 262-6900
Facsimile: (212) 977-1649

MOEKA TAKAGI, ESQ.
CA Bar No. 333226
*(Pro hac vice)*
mtakagi@perkinscoie.com
**PERKINS COIE LLP**
3150 Porter Drive
Palo Alto, CA 94304
Telephone: (650) 838-4494
Facsimile: (650) 838-4350

**ATTORNEYS FOR DEFENDANT HMD AMERICA, INC.**

*/s/ Joseph W. Bain*

JOSEPH W. BAIN, ESQ.
Florida Bar No. 860360
Email Address: jbain@shutts.com
JODI-ANN TILLMAN, ESQ.
Florida Bar No. 1022214
Email Address: jtillman@shutts.com
**SHUTTS & BOWEN LLP**
1100 CityPlace Tower
525 Okeechobee Boulevard
West Palm Beach, Florida 33401
Telephone: (561) 835-8500
Facsimile: (561) 650-8530

**ATTORNEYS FOR DEFENDANT HMD AMERICA, INC.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of October, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which served a copy on the following:

| | |
|---|---|
| Howard L. Wernow, B.C.S.<br>Fla Bar No. 107560<br>**SAND, SEBOLT & WERNOW CO., LPA**<br>Aegis Tower – Suite 1100<br>4940 Munson Street NW<br>Canton, Ohio 44718<br>Telephone: (330) 244-1174<br>Facsimile: (330) 244-1173<br>Email: howard.wernow@sswip.com<br><br>**Attorneys for *Plaintiff, Vibrant Licensing LLC*** | Cortney S. Alexander, Esq. (*pro hac vice)*<br>**KENT & RISLEY LLC**<br>5755 North Point Pkwy. – Suite 57<br>Alpharetta, Georgia 30022<br>Telephone: (404) 855-3867<br>Email: cortneyalexander@kentrisley.com<br><br>**Attorneys for *Plaintiff, Vibrant Licensing LLC*** |

By: *\/s/ Joseph W. Bain*

Joseph W. Bain
Florida Bar No. 860360
jbain@shutts.com